ELECTRONIC ENGINEERING
COMPANY, Appellant,

v.

FEDERAL COMMUNICATIONS
COMMISSION, Appellee,

PageMart II, Inc. and Personal
Communications Industry
Association, Intervenors.

No. 97–1255.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 2, 1998.

Decided April 14, 1998

Rehearing Denied June 11, 1998.

Timothy E. Welch, Silver Spring, MD, argued the cause and filed the briefs for appellant.

Roberta L. Cook, Counsel, Federal Communications Commission, Washington, DC, argued the cause for appellee, with whom Christopher J. Wright, General Counsel, and Daniel M. Armstrong, Associate General Counsel, were on the brief. John E. Ingle, Deputy Associate General Counsel, entered an appearance.

David E. Weisman and Alan S. Tilles, Washington, DC, were on the brief for intervenor Personal Communications Industry Association, Ltd.

Before: SENTELLE, TATEL and GARLAND, Circuit Judges.

SENTELLE, Circuit Judge:

Electronic Engineering Company ("EEC") appeals a decision of the Federal Communications Commission allowing PageMart II, Inc. ("PageMart") to use private paging frequency 929.7625 MHz on an exclusive nationwide basis. EEC argues that the Commission should have dismissed PageMart's applications because the Personal Communication Industry Association ("PCIA"), the frequency coordinator for 900 MHz paging frequencies, unlawfully altered the frequency requested in PageMart's applications and submitted the amended applications to the Commission without obtaining additional signatures from PageMart. The Commission, interpreting its own rules, determined that frequency coordinators have the authority to alter a frequency request on an application before filing it with the Commission, provided that they act with the consent of the applicant. Because we conclude that the Commission's interpretation was neither plainly erroneous nor inconsistent with the rules, we affirm.

## I.

An applicant seeking to provide private land mobile radio services must obtain a frequency recommendation from a private organization known as a "frequency coordinator." A frequency coordinator, as defined by the FCC's rules governing private land mobile radio services, is simply an "entity or organization that has been certified by the Commission to recommend frequencies for use by licensees...." 47 C.F.R. § 90.7 (1994). Frequency coordinators were formed decades ago in response to FCC rules requiring that channels be used on a shared basis, and requiring that users and applicants cooperate in the selection and use of the frequencies to minimize interference. *See In re Frequency Coordination in the Private Land Mobile Radio Services,* 103 F.C.C.2d 1093, 1095 (1986) ("Report and Order"). To facilitate this process, interested parties organized frequency coordinating committees, which were comprised of entities using their services so that the recommendations would be both knowledgeable and impartial. *Id.*

The FCC formally recognized the role that frequency coordinators play in the selection process in 1958. The Commission first adopted rules simply providing that applicants could obtain frequency recommendations from these committees, and that the Commission would consider their recommendations when making assignment decisions. *In re Amendment of Part 11, Rules Governing the Industrial Radio Services, To Delete, Modify and Create Services and To Effect Changes in the Availability of Frequencies,*

*First Report and Order,* 23 Fed.Reg. 4784 (1958). In 1969, the Commission issued a Memorandum Opinion and Order that further clarified the role of frequency coordinators. The order makes clear, among other things, that a frequency coordinator must not discriminate between members and non-members, and that a coordinator's recommendation is not binding on either the applicant or the Commission. *In re Amendment of Section 91.8(a)(2) and (a)(3) of the Commission's Rules Relating to Frequency Coordination in the Industrial Radio Service,* 16 F.C.C.2d 299, 305–06 (1969).

In 1982, Congress amended the Communications Act and affirmed the FCC's authority to use frequency coordinators in the spectrum management process. 47 U.S.C. § 332(b)(1). The Commission subsequently revised its rules to improve the quality and efficiency of frequency selections. The amended rules provide that all applicants for private land mobile licenses that require frequency coordination must send their applications to the certified frequency coordinator. 47 C.F.R. §§ 1.912(b), 90.127(a). The coordinator is then required to perform appropriate coordination services. *Id.* The rules make clear that each application for frequencies in the 929–930 MHz band, the band at issue in this case, must include a "statement from the coordinator recommending the most appropriate frequency." 47 C.F.R. § 90.175(c). The frequency coordinator then forwards the application along with the frequency recommendation to the Commission for evaluation and decision. 47 C.F.R. §§ 1.912(b), 90.127(a).

The Report and Order that announced the new rules further elaborated upon the frequency coordination process. An applicant must send its completed application to the certified frequency coordinator (a single coordinator is certified for each service), rather than to the Commission. 103 F.C.C.2d at 1100, 1104–05. When submitting materials, the applicant can either request a particular frequency, or leave the selection of the frequency entirely to the coordinator. *Id.* at 1096–97, 1147. An applicant that requests a particular frequency must submit a technical justification for that frequency along with the application. *Id.* at 1147. Upon receiving the applications, the frequency coordinator is required to process the submissions in the order of receipt. *Id.* at 1104, 1119. The coordinator checks each application for "completeness, accuracy, and compliance with the Commission's rules." *Id.* at 1100. If the coordinator encounters an application that is incomplete or contains minor errors, the coordinator is authorized to make the necessary corrections with the applicant's approval. *Id.* at 1147. After reviewing the application, the coordinator evaluates the channel availability and identifies the most suitable frequency for that particular applicant. *Id.* at 1100, 1119. The coordinator then files the application, along with the frequency recommendation, directly with the Commission. *Id.* at 1100, 1104–05. If the coordinator disagrees with the frequency requested by the applicant, and if the applicant disapproves of the coordinator's recommendation, the coordinator must submit the application, the technical submission, the coordinator's written reasons for rejection, and the alternate frequency recommendation to the Commission. *Id.* at 1147–48.

All private paging systems were assigned on a shared basis until 1993, when the Commission amended its rules governing the 929–930 MHz band to grant channel exclusivity to qualified local, regional, and national paging systems.[1] Under the amended rules, incumbent systems had the first chance to obtain exclusivity rights. Incumbents were allowed thirty days from the date of the order to submit a request for exclusivity to PCIA (formerly known as the National Association of Business and Educational Radio, Inc., or "NABER"), the frequency coordinator for the 900 MHz private paging systems. Upon receipt of the requests, PCIA was required to review the submissions and then forward

---

1. *In re Amendment of the Commission's Rules To Provide Channel Exclusivity To Qualified Private Paging Systems at 929–930 MHz,* 8 F.C.C.R. 8318 (1993). The Commission has recently abandoned its exclusivity rules and implemented a new geographic licensing system. *In re Revision* of Part 22 and Part 90 of the Commission's Rules To Facilitate Future Development of Paging Systems, 12 F.C.C.R. 2732 (1997). That rule change, however, has no bearing on the Commission's decision in this particular case.

requests that satisfied the exclusivity criteria to the Commission for review and approval. Incumbent systems that satisfied the criteria would have exclusivity rights with respect to their existing authorizations as of the effective date of the rules. After the thirty-day transition period, PCIA would begin to process applications for exclusive licenses on a first-come, first-served basis, regardless of whether the applicant was an incumbent or a new entrant. However, all incumbents, regardless of whether they qualified for exclusivity, would be grandfathered with respect to their existing systems, so that no incumbent would have to relocate, change frequencies, or otherwise curtail previously authorized construction or operations.

On February 21, 1994, after the transition period had expired, PageMart submitted applications to PCIA for over three hundred sites, a sufficient number to qualify for an exclusive nationwide paging system. PageMart specifically requested to use frequency 929.4875 MHz. Over the next few months, PageMart submitted additional applications, requesting a total of 429 sites on the 929.4875 MHz frequency. On March 15, 1994, PCIA received PageMart's request for nationwide exclusivity on frequency 929.4875 MHz for the sites requested in previous applications. That same day, PCIA also received applications from EEC that sought to expand its existing system on 929.7625 MHz by twelve sites. Although EEC's existing system of thirty-eight sites had been eligible for local exclusivity during the transition period, EEC did not submit a request for exclusivity during that period of time. Indeed, EEC did not submit a request for exclusivity until October 17, 1994.

In May of 1994, PCIA began to evaluate the applications that PageMart had submitted the previous February. PCIA determined that the 929.4875 MHz frequency could not be coordinated on an exclusive nationwide basis because it had already been assigned to three exclusive regional systems. PCIA ultimately decided that 929.7625 MHz was the most appropriate frequency for use by PageMart on a national exclusive basis, because there were only a few exclusive local systems on that channel, and because no other channel was entirely clear and available for nationwide exclusive use. With

PageMart's consent, PCIA crossed out the frequency requested in PageMart's applications and exclusivity request and inserted frequency 929.7625 MHz. PCIA then filed PageMart's applications with the Commission.

A few weeks later, PCIA reached EEC's applications in the queue and considered its request for expanded usage of the 929.7625 MHz frequency. PCIA concluded that it could not approve EEC's request because it had already recommended PageMart's use of that frequency on an exclusive nationwide basis. As a result, EEC could continue to operate its existing sites on the 929.7625 MHz frequency on a grandfathered basis, but could not expand its use of that frequency if the FCC approved PageMart's applications.

EEC eventually filed a petition with the Licensing Division of the FCC's Wireless Telecommunications Bureau, seeking dismissal of PageMart's request for nationwide exclusivity because of alleged procedural irregularities. EEC objected to the fact that "an unidentified party has crossed out PageMart II, Inc.'s typewritten request for '929.4875' MHz and pencilled in '929.7625'" on PageMart's exclusivity request and on its applications. EEC contended that serious issues were raised concerning who changed PageMart's materials and when. PageMart responded that the frequency coordinator had made the changes before forwarding PageMart's applications to the Commission. PageMart further declared that PCIA had simply processed the applications in the order of receipt and had recommended that PageMart be allowed to use 929.7625 MHz. EEC replied that frequency coordinators lack the authority to alter applications or exclusivity requests, and also alleged that PCIA had shown unfair favoritism to PageMart. By a letter order, the Bureau's Land Mobile Division concluded that PCIA's handling of PageMart's applications was consistent with 47 C.F.R. § 90.175, even though the rule does not "provide specific procedures for amending applications while pending coordination."

EEC filed an Application for Review with the Commission. EEC once again argued that PCIA had no authority to alter Page-

Mart's applications without obtaining additional signatures, and that PCIA had shown improper favoritism to PageMart. The Commission concluded that PCIA's actions were consistent with its obligations as a frequency coordinator and accordingly denied review. *In re Electrical Engineering Co. and Page-Mart II, Inc. Requests for Exclusivity on 929.7625 MHz,* 12 F.C.C.R. 3819 (1997) ("Denial Order"). The Commission first concluded that PCIA acted within its authority when it changed the frequency requested on Page-Mart's applications. The Commission ruled that a frequency coordinator's authority to alter application materials derives from its duty to select the most appropriate frequency for each particular applicant. The Commission further concluded that there was no basis in the record to support the allegation that the applications submitted by PageMart and EEC received disparate treatment by PCIA. *Id.* at 3821–22.

EEC filed a timely appeal in this court.

### II.

■■■ EEC challenges the Commission's decision under section 706(2)(A) of the Administrative Procedure Act, which requires us to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). To prevail on its claim, EEC must overcome the highly deferential standard of review that we accord to an agency's interpretation of its own rules. *Bluestone Energy Design, Inc. v. FERC,* 74 F.3d 1288, 1292 (D.C.Cir.1996). Provided that it does not violate the Constitution or a federal statute, the agency's interpretation is entitled to controlling weight "unless it is plainly erroneous or inconsistent with the regulation." *Stinson v. United States,* 508 U.S. 36, 45, 113 S.Ct. 1913, 1919, 123 L.Ed.2d 598 (1993) (internal punctuation and citation omitted). We conclude that the Commission's decision easily survives this deferential standard of review.

### A.

We begin with EEC's claim that PCIA had no authority to alter PageMart's applications and submit materials to the Commission without obtaining additional signatures from a PageMart representative.

EEC first makes an argument based on the authority of frequency coordinators to correct clerical errors in applications. The Commission's 1986 Report and Order recognized that frequency coordinators have the power to correct minor errors in an application before forwarding it to the Commission: "In cases where the application submitted to the coordinator is incomplete or if there is an obvious error, we are allowing the coordinator to make the necessary corrections provided that applicant approval is obtained. Again, we believe allowing the coordinator to make minor changes will speed up the overall licensing process." 103 F.C.C.2d at 1147. EEC argues that PageMart's original request for the 929.4875 MHz frequency was not the sort of "obvious" error that frequency coordinators have the authority to "correct." Rather, EEC continues, PageMart's selection of 929.4875 MHz was a deliberate act, as evidenced by the consistent reference to this frequency in its applications and in its nationwide exclusivity request. EEC contends that the Commission, by approving PCIA's changes even though they did more than correct minor errors, effectively transformed the coordinators' limited authority into an all-inclusive amending power that extends to even the most substantive changes to an application.

The simple answer to EEC's objection is that PCIA did not make those changes pursuant to its authority to correct clerical errors. Frequency coordinators perform a variety of functions in the spectrum management process. Correcting clerical errors is one of those functions, but so is the selection of the most appropriate frequency for use by each particular applicant. 47 C.F.R. § 90.175(c); 103 F.C.C.2d at 1100. PCIA made changes to PageMart's applications as part of its responsibility to select the most appropriate frequency. PCIA determined that the 929.4875 MHz frequency would not be suitable for use by PageMart because other systems were operating on an exclusive regional basis on that channel. PCIA decided that the 929.7625 MHz frequency was the appropriate frequency for PageMart, and made changes to its applications only after receiving PageMart's consent to do so. While it may be the case

that a coordinator does not have unlimited power to correct application errors, PCIA did not purport to correct errors in Page-Mart's applications, but rather carried out its responsibility to select the most appropriate frequency for this particular applicant.

■ EEC also faults the Commission for relying on the silence of its rules as a basis for concluding that PCIA acted within its authority as a frequency coordinator. EEC draws special attention to the following passage in the Commission's order:

Rule 90.175(c) provides no specific instructions for handling changes to applications while pending coordination, and allows the frequency coordinator to recommend the most appropriate frequency. Other rule sections cover the execution of applications and amendments of applications before the Commission. Rule 90.175(c), however, does not explicitly incorporate those rule sections in connection with changes made to a proposal during prefiling procedures while still before the coordinator. Thus, absent evidence that the changes made were without authority of the applicant, or were made subsequent to the frequency coordinator's submission of the applications to the Commission, PageMart's applications and related exclusivity request for use of 929.7625 MHz were properly accepted for filing.

12 F.C.C.R. at 3821–22. In EEC's view, the silence of Rule 90.175(c) must be construed as a denial, not a grant, of power to frequency coordinators such as PCIA. Absent express authorization from the rules, EEC argues, coordinators lack the authority to amend applications and send them directly to the Commission. We disagree.

The Commission's reasoning in the Denial Order is quite clear. As the Commission explained, rule 90.175(c) provides that applications for frequencies in the 929–930 MHz band must include a "statement from the coordinator recommending the most appropriate frequency," but does not specify how the coordinator is to proceed when making its recommendation. 47 C.F.R. § 90.175(c). Nor does the rule elsewhere outline specific procedures that a frequency coordinator must follow when making changes to applications before they are filed with the Commis-

sion. Even the Commission's 1986 Report and Order does not speak directly to the question at hand. The Report and Order does explain how the coordinator is to proceed in one specific circumstance: if the coordinator disagrees with an applicant's frequency request, and if the applicant wants to pursue its request with the Commission, the coordinator is required to forward the application, the technical submission, the coordinator's written reasons for rejection, and the alternate frequency recommendation to the Commission. 103 F.C.C.2d at 1147–48. The Report and Order does not, however, specify how the coordinator is to proceed if the applicant agrees that the frequency selected by the coordinator is preferable to the frequency originally requested by the applicant.

After acknowledging that the rules do not speak directly to the question, the Commission returned to the basic requirement that coordinators recommend the "most appropriate frequency" for each particular applicant. 47 C.F.R. § 90.175(c). The Commission ultimately decided that altering a frequency request on an application was an acceptable way to make a frequency recommendation, provided that the applicant approves the changes in advance of filing the applications with the Commission. 12 F.C.C.R. at 3821–22. We conclude that the Commission's interpretation was neither "plainly erroneous" nor "inconsistent with the regulation." *Stinson*, 508 U.S. at 45, 113 S.Ct. at 1919. The rules require coordinators to make frequency recommendations, but do not specify how they are to proceed in every conceivable circumstance. The Commission's reading gave content to these open-ended provisions without compromising any other requirements in the rules. EEC has presented us with no reason to conclude that a coordinator's duty to "recommend[ ] the most appropriate frequency" cannot be performed by making changes directly to application materials. 47 C.F.R. § 90.175(c). Accordingly, we defer to the Commission's interpretation that a coordinator may recommend a frequency by making changes to an application, with the applicant's consent, before forwarding the materials to the Commission.

Equally unavailing is EEC's argument that a frequency coordinator cannot alter an application without obtaining an additional signature from the applicant. EEC cites to a number of provisions in the rules that purportedly required PCIA to return PageMart's applications and exclusivity request for additional signatures. For example, EEC draws our attention to section 90.131(a), which provides that "[e]ach amendment to an application shall be signed and submitted in the same manner as required for the original application." 47 C.F.R. § 90.131(a); *see also* §§ 1.743(a), 1.913(a). EEC also cites to a few cases before the Commission in which the FCC mentioned a signature requirement. *See, e.g., R & L Broadcasters,* 8 F.C.C.R. 7031, 7032 (1993); *WMOZ, Inc.,* 36 F.C.C. 202, 218 (1964). In EEC's view, a change in frequency constitutes an amendment to the original application, and thus requires the coordinator to obtain an additional signature before forwarding the amended application to the Commission.

None of the rules cited by EEC requires frequency coordinators to jump through this additional procedural hoop. As the Commission explained, the rules relied upon by EEC govern amendments to applications that have been filed with the Commission. 12 F.C.C.R. at 3821. Frequency coordination, however, is clearly a pre-filing procedure. Frequency coordinators are to file the applications directly with the Commission after they have performed "appropriate frequency coordination." 47 C.F.R. §§ 1.912(b), 90.127(a); 103 F.C.C.2d at 1104–05. Contrary to EEC's assumption, applications are not considered to be filed with the Commission when they are received by the coordinator, but only when they are received by the Commission at its designated location. 47 C.F.R. § 1.7 (1997). At the time that it altered Page-Mart's applications, PCIA obviously had not filed the applications with the Commission, and thus PCIA was not bound by rules that govern post-filing amendments.

The cases cited by EEC are off the mark. Two of the cases, like the rules cited by EEC, concerned amendments to applications already filed with the Commission. *R & L Broadcasters,* 8 F.C.C.R. at 7032; *CSJ Investments, Inc.,* 5 F.C.C.R. 3741, 3742 (Rev.

Bd.1990). Two others involved applicants who attested to the contents of their applications even though the applications were not complete at that time. *Johnston Broadcasting Co. v. FCC,* 175 F.2d 351, 354 (D.C.Cir. 1949); *WMOZ, Inc.,* 36 F.C.C. 201, 218 (1964). The last case cited by EEC discussed whether it was proper to dismiss applications containing only facsimile signatures instead of handwritten signatures. *SBM Communications, Inc.,* 7 F.C.C.R. 3436, 3436 (1992). Not only did none of these cases purport to discuss whether frequency coordinators are required to obtain additional signatures from applicants when making changes to applications, none of them involved frequency coordinators at all.

Moreover, the 1986 Report and Order undermines the notion that frequency coordinators must obtain additional signatures. The Order requires frequency coordinators to forward applications directly to the Commission, but makes no mention of returning material to applicants to gain approval of their frequency recommendations. 103 F.C.C.2d at 1104–05. Indeed, the Commission initially proposed that a coordinator return an application if it disagrees with a request for a specific frequency, but ultimately decided against this proposal in its final rules. *See Frequency Coordination in the Private Land Mobile Radio Services,* 49 Fed.Reg. 45454, 45457 (proposed Nov. 16, 1984); 103 F.C.C.2d at 1100, 1147–48. Even more illuminating is the procedure for handling applications that do not request any particular frequency. The Report and Order makes clear that applicants are free to request a specific frequency, but are under no obligation to do so. 103 F.C.C.2d at 1096–97, 1147. The rules contemplate, in other words, that some applicants will send their materials to frequency coordinators with blank frequency requests. Frequency coordinators, consistent with their obligation to recommend the most appropriate frequency, fill in the blank frequency requests and forward the applications directly to the Commission for review and approval. The Commission accepts such applications for filing, even though the applicant did not request any particular frequency, and even though the coordinator inserted a frequency in the appli-

cant's materials without obtaining an additional signature. If a frequency coordinator can fill in a blank frequency request without an additional signature, we see no reason why an additional signature would be required if the coordinator, acting with the consent of the applicant, changes the frequency request in an applicant's materials before forwarding the application to the Commission.

■ Finally, EEC argues that PageMart's applications must be considered untimely vis-a-vis EEC's applications for 929.7625 MHz even though PageMart submitted applications to PCIA before EEC submitted its applications. The basis for this argument is a rule providing that an application that is "substantially amended" will be considered newly filed as of the date of the filing of the amendment. 47 C.F.R. § 1.918(b); *see also* 47 C.F.R. § 90.165(d)(1) (1997). EEC cites to a number of scattered provisions, many of which do not involve private radio services, to make the point that a change in frequency constitutes a substantial amendment to an application. *See* 47 C.F.R. §§ 1.962(c)(1), 73.3571(a)(1), 73.3572(a)(1)(i), 73.3573(a)(1), 74.911(a)(1), 74.1233(a)(1); *see also* §§ 22.123(e)(6), 90.164(a), 90.165(d) (1997). EEC concludes from these provisions that PCIA's changes to PageMart's applications amounted to substantial amendments, which moved PageMart's applications to the end of the queue and thus behind the application submitted by EEC.

Like the argument about the signature requirement, this argument fails because the rules cited by EEC apply to applications that have been filed with the Commission. *See, e.g.,* 47 C.F.R. § 1.962(c) (referring to a "substantial amendment of an application *on file*") (emphasis added). Nothing in rule 90.175, which outlines the requirements for frequency coordination, gives any indication that the Commission incorporated these provisions and imposed such procedural strictures on frequency coordinators. 47 C.F.R. § 90.175. Moreover, the logical consequence of EEC's argument would be to move an application to the end of the queue whenever the applicant agrees that the frequency selected by the coordinator is preferable to the frequency originally requested by the applicant. This cumbersome result would seem to be in tension with the more specific mandate that frequency coordinators process applications "in order of receipt." 103 F.C.C.2d 1104, 1119. Furthermore, various parts of the Report and Order mention the need to give frequency coordinators flexibility in carrying out their coordination responsibilities. 103 F.C.C.2d at 1109, 1115. Absent an express provision in the rules, there would seem to be little reason to encumber the coordinator's task by requiring it to move to the end of the queue applications that the coordinator has already considered. In sum, the Commission did not err when it concluded that the provisions cited by EEC did not require PCIA to move PageMart's applications to the end of the queue.

B.

■ EEC next charges that PCIA violated the Commission's rules requiring coordinators to handle applications in a nondiscriminatory manner by affording disparate treatment to the EEC and PageMart applications. 103 F.C.C.2d 1101–02. EEC contends that PCIA went the extra mile for PageMart when coordinating its applications, but failed to provide even basic assistance to EEC. EEC asserts, for example, that PCIA recommended an alternative frequency to PageMart when 929.4875 MHz was unavailable but made no similar efforts on behalf of EEC. EEC faults the Commission for returning its applications without even searching for an alternative frequency. EEC also complains that PCIA delayed processing its applications, failed to explain the reason for the delay, and did not inform EEC why its applications could not be coordinated as requested. EEC speculates that PageMart received favorable treatment because PageMart, unlike EEC, is a member of PCIA and pays significant membership and coordination fees to the organization.

EEC's depiction of the facts does not square with the record, which reveals that PCIA processed the applications in full compliance with the Commission's rules. PCIA, like all frequency coordinators, had a duty to process the applications in the order of receipt. 103 F.C.C.2d at 1100, 1104, 1119. PageMart's applications arrived almost a

month before EEC's applications, so PCIA naturally considered PageMart's applications first. PCIA determined that the frequency requested by PageMart would not be suitable for nationwide exclusive use because several regional systems already operated on that channel on an exclusive basis. PCIA recommended an alternative frequency, 929.7625 MHz, for use by PageMart because there were only a few exclusive local systems on that frequency and because no other channel was entirely clear and available for nationwide use. With PageMart's approval, PCIA crossed out the frequency requested by PageMart and inserted a request for 929.7625 MHz, then filed the applications with the Commission.

When it reached EEC's applications in the queue, PCIA could not approve the request for expanded usage of 929.7625 MHz because it had already sanctioned PageMart's use of that channel on an exclusive nationwide basis. PCIA promptly notified EEC that it could not expand its system on 929.7625 MHz due to the assignment of that channel to PageMart. EEC responded by asking PCIA to hold its applications while it attempted to obtain a co-channel concurrence agreement with PageMart. PCIA returned EEC's applications only after two months had elapsed without receiving any update from EEC regarding the status of its applications. In sum, the record reveals that the process worked precisely the way that it is intended to operate: the frequency coordinator processed the applications on a first-come, first-served basis, gave expeditious review to the applications, and informed the applicants of the status of their submissions in a prompt manner. PCIA cannot be faulted for failing to recommend an alternative frequency to EEC, given EEC's request to put the applications on hold while it negotiated a deal with PageMart. There is simply nothing in the record to support EEC's allegation that PCIA breached its duty to process applications with "total impartiality." 103 F.C.C.2d at 1101.

## C.

█ Finally, EEC criticizes the Commission for failing to explain why 929.7625 MHz was the most appropriate frequency for use by PageMart. EEC points out that the De-

nial Order only briefly mentioned the coordinator's reasons for recommending 929.7625 MHz: "PCIA ultimately determined that the best choice for PageMart's nationwide system would be 929.7625 MHz because there were only a handful of exclusive local systems on that channel, and there were no alternative totally clear channels available." 12 F.C.C.R. at 3820. EEC contends that the Commission did not engage in reasoned decisionmaking because it offered an inadequate justification for the selection of this particular frequency. However, EEC did not contest the frequency selected by PCIA in its arguments before the Commission, which helps to explain why the Commission gave this issue only brief attention in its Denial Order. EEC also neglected to file a petition for reconsideration of the FCC's order to challenge the selection of this particular frequency. Under applicable law, we have no authority to address the merits of an allegation of error that EEC failed to raise in the proceedings before the Commission. 47 U.S.C. § 405(a); *American Tel. & Tel. Co. v. FCC*, 974 F.2d 1351, 1354 (D.C.Cir.1992) ("We have construed this section as codifying the exhaustion of administrative remedies doctrine, which requires complainants, before coming to court, to give the FCC a fair opportunity to pass on a legal or factual argument.") (internal punctuation and citation omitted).

## III.

For the reasons set forth above, the decision of the Commission is affirmed.